IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR 110-032 |
| | ) | |
| VARTRON MISCKO NERO | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused Defendant of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). The matter is now before the Court on Defendant's motions to suppress "all physical evidence seized during the Richmond County traffic stop which occurred on October 28, 2009." (Doc. nos. 18, 25, 33).[1] Defendant moves to suppress the .357 Magnum revolver, six rounds of ammunition located in the car in which he was a passenger, as well as any statements he made to officers during the traffic stop or thereafter. The government filed its opposition to Defendant's particularized motion to suppress. (Doc. no. 29). The Court held an evidentiary hearing on March 23, 2010, at which time the Court

---

[1] Defendant filed a preliminary motion to suppress, and upon prompting from the Court, he filed a particularized motion pursuant to Loc. Crim. R. 12.1. (See doc. nos. 18, 20, 25). After the government responded to the particularized motion to suppress, Defendant filed an "Amendment To Particularized Motion To Suppress." (Doc. no. 33). Although the Court's recommendation to deny the request for suppression applies to all of Defendant's motions, for ease of reference, the Court will refer to these motions as one motion to suppress.

heard testimony from Investigators James Swint and Jason Saal; both are Investigators with the Richmond County Sheriff's Department ("RCSD"), Narcotics Division.[2] For the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

I.   **FACTS**

   A.   **The Testimony of Investigator Swint**

Investigator Swint testified that he has been with the RCSD for six years and that the last three of the six years he has been in the Narcotics Division. (FTR 2:07:40).[3] Investigator Swint also testified that on October 28, 2009, he was on patrol in an unmarked 2008 Chevrolet Impala in the Barton Village area of Augusta. (FTR 2:08:40). He was on patrol with Investigator Saal, Investigator Philip Hambrick, and Investigator Richard Cowell. (FTR 2:10:10). The Barton Village area is known to Investigator Swint as a gang-oriented, high crime area. (FTR 2:08:50). Since he has been with the RCSD, he has been involved in a federal wire tap attempting to dismantle a specific gang operating within Barton Village. (FTR 2:09:00). Investigator Swint has also been a part of obtaining numerous drug search warrants, as well as numerous street level drug arrests. (FTR 2:09:00). More specifically, in his three years as a narcotics officer, Investigator Swint has made at least five arrests in Barton Village, and he is aware of other officers within the RCSD having made at

---

[2]Defendant invoked the Rule of Sequestration at the hearing.

[3]Although a transcript of the March 23, 2010 hearing has not been prepared, the Court was able to review the proceedings on the Court's recording system, For the Record ("FTR").

least twenty to thirty arrests in that same area. (FTR 2:09:06). Investigator Swint also testified that although he was traveling in an unmarked car, the car "might as well have markings" because people recognize the car as a police car. (FTR 2:09:50). Investigator Swint noted that it is not uncommon for people to give them a "funny look," and "call out 'narcs' or 'police' " when they see the unmarked car enter the Barton Village area. (FTR 2:09:55).

On the night of October 28, 2009, Investigator Swint was driving the unmarked car; Investigator Saal was in the front passenger seat; and Investigators Hambrick and Cowell were in the back seat. (FTR 2:10:25). The Investigators were traveling south on Dublin Drive, crossing London Boulevard, at approximately 9:00 p.m., when they observed a silver Dodge Charger (hereinafter "the Charger") parked in the middle of the street facing north. The passenger in the Charger, who was later determined to be Defendant, was standing outside the Charger, at the front passenger tire. (FTR 2:11:00). As the Investigators got closer to the Charger, according to Investigator Swint, Defendant looked up at the unmarked car, gave a startled look, and quickly shuffled back into the front passenger seat of the Charger. Investigator Swint testified that he pulled the unmarked car up to the Charger and parked. The Investigators, who were all wearing their Sheriff's - issued vests,[4] exited the car and walked in the direction of the Charger. Investigator Swint next testified that as soon as the driver of the Charger saw the Investigators in their Sheriff's vests, he placed the Charger into "drive" and began to drive away. At that point, Investigator Swint instructed the driver

---

[4]The Sheriff's - issued vests have the word "Sheriff" written in six inch gold letters across the chest and back. (FTR 2:12:00).

3

of the Charger to stop, which he did.

Investigator Swint stated that Investigators Saal and Cowell approached the passenger's side of the Charger, while he and Investigator Hambrick approached the driver's side of the Charger.[5] According to Investigator Swint, Investigator Cowell asked Defendant if there were any drugs or weapons in the car; Defendant responded that he had a gun underneath him. At that point, Investigator Cowell asked Defendant to exit the Charger; when he did, Investigator Saal observed the .357 Magnum on the passenger seat. (FTR 2:11:55). From the time the Investigators crossed London Boulevard until the time the gun was observed, at most, one to two minutes had passed. From the time that the officers exited the unmarked car until the gun was observed, approximately 45 seconds passed. (FTR 2:16:00).

Investigator Swint testified that once he directed the driver of the Charger to stop, the driver was not free to leave. (FTR 2:18:25). Additionally, Investigator Swint testified that Defendant did not run from the scene and that no traffic citations were issued to the driver of the Charger. Investigator Swint did not ask the driver of the Charger whether it was disabled. (FTR 2:20:15). Furthermore Investigator Swint acknowledged that he did not detect an odor of drugs or alcohol emanating from the Charger. (FTR 2:21:10). He further acknowledged that the Investigators were not in the Barton Village area looking for these men based on a tip. (FTR 2:22:10). Investigator Swint testified that when he first observed Defendant, Defendant did not appear to be engaged in any illegal activity. (FTR 2:22:15).

---

[5]When Investigator Swint approached the driver, he requested the driver's identification; the driver complied and provided Investigator Swint with his driver's licence. (FTR 2:17:15).

4

Finally, Investigator Swint testified that no drugs or stolen contraband were found in the Charger. (FTR 2:22:18).

### B. The Testimony of Investigator Saal

Investigator Saal testified that he has been with the RCSD for approximately three years. (FTR 2:24:35). He further stated that within the RCSD, Barton Village is known as a "high crime, high drug area." Investigator Saal testified that he has made several drug arrests in the Barton Village area, and he is aware that other officers in the RCSD have also made drug arrests in that area. Investigator Saal stated that he had previously patrolled the Barton Village area in an unmarked car. He noted that all the unmarked vehicles are "highly recognized"; the officers in the unmarked vehicles often hear people say, "Here are the narcs," or, "There come the boys." (FTR 2:28:30).

On the night of October 28, 2009, Investigators Swint, Saal, Hambrick and Cowell were conducting a routine patrol in the Barton Village area in Investigator Swint's unmarked car. (FTR 2:26:25). Investigator Saal, who was sitting in the front passenger seat of the unmarked car, stated that when they crossed the London Boulevard intersection heading south on Dublin Drive, he observed the silver Charger parked in the middle of the street. He also observed Defendant standing outside of the Charger on the passenger side near the front passenger tire. (FTR 2:27:00). Investigator Saal stated that when Defendant observed the unmarked car, he began acting suspiciously and had a "deer in the headlights" expression, as if he was unsure how to act (for example, whether he should run, or walk away). (FTR 2:27:10). At that point, Defendant "scurried" back into the Charger. (FTR 2:27:30).

5

Next, Investigator Saal testified that Investigator Swint stopped the unmarked car next to the Charger. (FTR 2:30:00). Once all of the officers – wearing their Sheriff's raid vests[6] – had exited the unmarked vehicle, the driver of the Charger immediately put it in "drive" and attempted to drive off. (FTR 2:30:20, 2:30:50). At that point, Investigator Swint instructed the driver of the Charger to stop. (FTR 2:30:40). The Charger had moved no more than two to three feet. (FTR 2:31:16).

Investigators Swint and Hambrick approached the driver's side of the Charger, and Investigators Saal and Cowell approached the passenger's side of the Charger. (FTR 2:31:18). Investigator Saal next testified that because the officers come into contact with so many people, it is routine for them to question the individuals as to whether they have any weapons or narcotics inside the vehicle. (FTR 2:31:31). When Investigator Cowell asked Defendant if he had any drugs or weapons, Defendant responded that he had a gun underneath him. (FTR 2:31:50). Investigator Saal, had not, at that point requested any identification from Defendant. (FTR 2:32:00). Once Defendant acknowledged having a gun, Investigator Cowell had Defendant exit the Charger. When Defendant had exited the Charger, Investigator Saal observed the .357 Magnum on the front passenger seat. (FTR 2:32:20). From the time that the Investigators crossed the intersection at London Boulevard until the gun was discovered, no more than two minutes had passed. (FTR 2:32:35). From the time that the officers exited their unmarked car until the gun was discovered, only 45 seconds had passed. (FTR 2:32:50).

---

[6]Investigator Saal also noted that the Sheriff's vests are black with the word "sheriff" in bright yellow letters in the front and in the back. (FTR 2:20:50).

6

Investigator Saal stated that the driver and Defendant were not free to leave the scene once Investigator Swint directed the driver of the Charger to stop. (FTR 2:38:00). He further testified that it did not appear that Defendant was engaged in any criminal activity, nor did Defendant run off. (FTR 2:38:00). The driver of the car was not speeding or driving erratically. (FTR 2:37:15). Investigator Saal did not detect any odor of drugs or alcohol emanating from the Charger. (FTR 2:39:00). He also stated that he did not know if the Charger was disabled, but acknowledged that no citations were issued and no drugs or stolen contraband were found. (FTR 2:39:35, 2:40:50, 2:41:00). Investigator Saal further acknowledged that the Investigators were not in Barton Village looking for Defendant based on a tip. (FTR 2:40:20).

## II.   DISCUSSION

### A.   The Respective Burdens of the Parties

As a general matter, a defendant contending that a search violated his Fourth Amendment rights must demonstrate that the search was illegal and that he had a legitimate expectation of privacy in the property searched. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). Nevertheless, "[u]pon a motion to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983), *cert. denied*, 465 U.S. 1023 (1984); see also United States v. Waldrop, 404 F.3d 365, 368 (5th Cir. 2005) ("A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. However, where a

7

police officer acts without a warrant, the government bears the burden of proving that the search was valid." (citation omitted)). Thus, "[t]he [g]overnment must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment [sic]." Freire, 701 F.2d at 1519; see also United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977). Accordingly, although Defendant must demonstrate that the warrantless search of the Dodge Charger implicated his Fourth Amendment rights, once he has done so, the burden shifts to the government to show that an exception to the warrant requirement applies.[7]

### B.     The Stop of the Vehicle

Defendant alleges that the driver of the Charger did not commit any traffic violation whatsoever, and as such, there was no justification for the officers to stop his vehicle. (Doc. no. 25). The government contends that the stop was justified based upon a reasonable suspicion sufficient to support an investigative stop. (Doc. no. 29). The government has the better argument.

The reasonableness of an investigative stop turns on two inquiries: 1) whether the stop was reasonable at its inception, and 2) whether the stop became unreasonable in its scope or duration. See United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). Under Terry v. Ohio, 392 U.S. 1, 30 (1968), the police may briefly stop and detain persons in order to

---

[7]The government concedes for the purposes of this motion, where the driver of the Charger was seized within the meaning of the Fourth Amendment, Defendant has standing to contest the seizure. (Doc. no. 29, p. 4 n.3 (citing Brendlin v. California, 551 U.S. 249, 254 (2007)).

8

investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" requires that an officer have more than a "hunch" that criminal conduct is afoot based on unparticularized facts. The officer must be able to articulate some minimal, objective justification for the investigatory detention. Acosta, 363 F.3d at 1145; United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

A reasonable, articulable suspicion to justify a stop can be based on the "collective" knowledge of all the officers involved in the stop. Acosta, 363 F.3d at 1145. Here, Investigators Swint and Saal testified that they were patrolling an area known to be a "high crime, high drug" area. Specifically on this issue, the Investigators testified that between the two of them, they had made at least eight arrests in the area, and that other officers in the RCSD had made at least twenty to thirty arrests in the area. In addition, Investigator Swint testified that he had been involved in executing numerous search warrants and had been a part of a wire tap investigation to dismantle a gang in that area. The Investigators also

testified that although they were traveling in an unmarked car, the RCSD unmarked cars are "highly recognized" as belonging to the RCSD.

Turning to the events that occurred on the night of October 28, 2009, the record reflects that the Investigators observed the Charger stopped in the street, with Defendant standing at the front quarter panel of the passenger side of the Charger. The Investigators both testified that when Defendant observed the unmarked car, he first made a startled/"deer in the headlights" expression and then immediately scurried back into the Charger. Investigator Swint then stopped his unmarked car adjacent to the Charger and all four Investigators in the unmarked car exited the car and walked toward the Charger. The Investigators testified that they were all wearing their Sheriff's vests that had "Sheriff" written across the chest and back in large yellow/gold letters. The Investigators testified that as soon as the driver of the Charger saw the Investigators walking towards the car, he put the Charger into "drive" and proceeded to drive away.

At this point, the Investigators clearly had a reasonable and articulable suspicion to stop the Charger and investigate further. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (holding unprovoked flight of defendant in an area of heavy narcotics trafficking was a proper basis for a Terry stop). Furthermore, the Eleventh Circuit has found that where a defendant "ran or walked very quickly toward the adjacent car after making eye contact with the police, and then drove off in that car in the opposite direction from the police," coupled with the characteristics of the area, adequately justified the stop by the police. United States

v. Gordon, 231 F.3d 750, 757 (11th Cir. 2000).[8]

Defendant argues that the stop was pretexual. Defendant states that because neither Defendant nor the driver were engaged in an illegal activity, the stop was unreasonable and any evidence obtained during the stop should be suppressed. The Court is not persuaded by this argument. "A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." Gordon, 231 F.3d at 754 (citing Wardlow, *supra*). In light of Defendant's reaction of scurrying back into the Charger upon recognizing the unmarked car (expressed by the "deer in headlights" look), the actions of the driver of the Charger driving away as soon as he saw the four Investigators – in their Sheriff's vests – approaching his car, coupled with the Investigators' knowledge that they were in a high crime area, the Investigators had adequate grounds for a Terry stop.

Next, it cannot be said that the stop became unreasonable in its duration or scope. See Acosta, 363 F.3d at 1145; see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). As already discussed above, the stop was not unreasonable at its inception because the Investigators had a reasonable, articulable suspicion justifying the stop. Nor did the search become unreasonable in its scope or duration. In an effort to determine what the driver of the Charger and Defendant were doing, the Investigators, approached the driver and Defendant in order to question them. Pursuant to their custom, the Investigators

---

[8]Indeed, the facts in Gordon are very similar to the facts in the case *sub judice*. In Gordon, officers on a routine patrol in an area known for drug sales and drive-by shootings observed the defendant and three others standing ten feet behind their car. Gordon, 231 F.3d at 756. When the men observed the officers, the officers testified that their "eyes lit up," resembling deer staring into an automobile's headlights. Id. The defendant and three men then proceeded to run, or at least walked very quickly, to back to their car and drive away. Id.

asked Defendant whether there were any drugs or weapons in the car. Defendant immediately acknowledged that he had a gun. Indeed, here the record reflects that within 45 seconds of Investigator Swint directing the driver of the Charger to stop, Defendant admitted to having a gun. United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (approximately seventy-five (75) minutes of detention in handcuffs was not unreasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (stop of approximately fifty (50) minutes awaiting the arrival of a canine unit was not unreasonable).

Furthermore, the Investigators only asked Defendant to exit the car after he had admitted to having a gun. For the Investigators' safety, they asked Defendant to exit the Charger; when he did, the .357 Magnum was resting in plain view on the front passenger seat. The Eleventh Circuit has held that "officers may . . . otherwise restrain a suspect during an investigatory stop when such action is reasonable under the circumstances to protect themselves or the public, or to maintain the status quo." United States v. Williams, 185 Fed. App'x 866, 869 (11th Cir. 2006) (citing United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989)); United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir.1985); Gil, 204 F.3d at 1350-51). Also noteworthy, the Eleventh Circuit has held that where an initial stop of a vehicle was a legitimate investigatory stop based on reasonable suspicion, the subsequent seizure of a shotgun in plain view was permissible. United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991).

In any event, Defendant acknowledges that the threshold issue in this case is whether there was a valid reason to stop the car. (Doc. no. 25, pp. 4-5). Indeed, Defendant argues that the Charger should never have been stopped; therefore any consent given in this case

was the product of the illegal stop and detention. (Id. at 5). As such, Defendant claims that any evidence obtained during the stop should be suppressed. (Id.). Here the Court found that the Investigators clearly had a reasonable, articulable suspicion to justify the stop of the Charger and investigate further. Therefore, Defendant's argument regarding the legality of the initial stop and his request to suppress the evidence seized, fails.

## III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the motions to suppress (doc. nos. 18, 25, 33) be **DENIED.**

SO REPORTED and RECOMMENDED this 2nd day of April, 2010, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE